**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, ABKCO MUSIC & RECORDS, INC., SONY MUSIC ENTERTAINMENT, ARISTA MUSIC, ARISTA RECORDS LLC, SONY MUSIC ENTERTAINMENT US LATIN, ZOMBA RECORDING LLC, ATLANTIC RECORDING CORPORATION, ELEKTRA ENTERTAINMENT GROUP INC., LAVA RECORDS LLC, RHINO ENTERTAINMENT LLC, WARNER MUSIC INC., WARNER MUSIC INTERNATIONAL SERVICES LIMITED, AND WARNER RECORDS INC., | Civ. Case No. 21-cv-5050  **COMPLAINT**  TRIAL BY JURY DEMANDED |
| Plaintiffs, |  |
| v. |  |
| FRONTIER COMMUNICATIONS CORPORATION, |  |
| Defendant. |  |

Plaintiffs UMG Recordings, Inc., Capitol Records, LLC, and ABKCO Music & Records, Inc. (collectively, the "Universal Plaintiffs"); Plaintiffs Sony Music Entertainment, Arista Music, Arista Records LLC, Sony Music Entertainment US Latin, and Zomba Recording LLC (collectively, the "Sony Plaintiffs"); and Plaintiffs Atlantic Recording Corporation, Elektra Entertainment Group Inc., Lava Records LLC, Rhino Entertainment LLC, Warner Music Inc., Warner Music International Services Limited, and Warner Records Inc. (collectively, the "Warner Plaintiffs," and together with the Universal Plaintiffs and the Sony Plaintiffs, the

"Plaintiffs") by and through their attorneys Oppenheim + Zebrak, LLP, for their Complaint, hereby allege, against Defendant Frontier Communications Corporation ("Frontier"), on personal knowledge as to matters relating to themselves and on information and belief as to all other matters, as set forth below:

## NATURE OF THE ACTION

1.      Plaintiffs comprise record companies that produce, manufacture, distribute, sell, and license commercial sound recordings, both in the United States and internationally.  Through their enormous investments of money, time, and exceptional creative efforts, Plaintiffs and their recording artists have created, produced, developed, marketed, and distributed musical works performed by some of the world's most famous and popular artists.  Plaintiffs own and/or control in whole or in part the copyrights and/or exclusive rights in innumerable sound recordings. Plaintiffs bring this action to remedy a massive violation of their rights under 17 U.S.C. §§ 106, 501, and 1401 *et seq*.[1]

2.      Frontier is one of the largest Internet service providers in the United States.  In 2019, Frontier had approximately 3.5 million Internet subscribers.  At all pertinent times, Frontier's customers paid Frontier substantial subscription fees for access to and use of its high-speed Internet network, with Frontier offering a tiered pricing structure based on the speed of service.  Frontier markets its high-speed service as enabling subscribers to "[d]ownload 10 songs in 3.5 seconds."

3.      At all pertinent times, Frontier knew that its subscribers were using its high-speed network to illegally download and distribute Plaintiffs' sound recordings on Frontier's network.

---

[1] All references to infringements and infringing activity below refer to reproductions and/or distributions of copyrighted works without authorization.  Likewise, all references to infringers refer to subscribers who reproduce and/or distribute copyrighted works without authorization.

Frontier has received hundreds of thousands of copyright infringement notices from copyright owners, including Plaintiffs, but chose not to act on those notices and address the rampant infringement on its network.

4.     Through the provision of its services to known infringers, Frontier knowingly contributed to, and reaped substantial profits from, massive copyright infringement committed by thousands of its subscribers, causing great harm to Plaintiffs, their recording artists, and others whose livelihoods depend upon the lawful sale and distribution of music.  Frontier's contribution to its subscribers' infringement is both willful and material, and renders Frontier liable for its subscribers' infringing activity.

5.     The infringement notices sent by Plaintiffs and other copyright owners advised Frontier of its subscribers' blatant and systematic use of Frontier's Internet service to illegally download, copy, and distribute copyrighted works through illicit BitTorrent sites and other online file-sharing services.

6.     Frontier failed to adequately respond to these notices.  It deliberately refused to take reasonable measures to curb its subscribers from using its service to infringe on the copyrights of others, including Plaintiffs, despite having direct knowledge of *particular subscribers* engaging in *specific, repeated acts* of infringement.

7.     It is well-established law that a party may not contribute to infringing behavior that it knows is occurring.  Further, a party with a direct financial interest in the infringing activity has a responsibility to stop or limit it, when it has the right and practical ability to do so.  Despite its professed commitment to prohibit infringement on its network, Frontier ignored its own policy and deliberately failed to act on infringement notices.  Frontier provided known repeat infringers with continued access to and use of its network and failed to terminate the

accounts of, or otherwise take any meaningful action against, those subscribers.  In reality, Frontier operated its network as an attractive tool and safe haven for infringement.

8.     Frontier derived an obvious and direct financial benefit from its subscribers' infringement.  Frontier marketed and promoted the high speeds of its network to attract those using peer-to-peer ("P2P") networks to infringe.  The unlimited ability to download and distribute Plaintiffs' works through Frontier's service served as a draw for Frontier to attract and retain serial infringers as customers, and, as a consequence, to charge them higher fees for increased bandwidth and higher-tiered service.  Moreover, by failing to terminate the accounts of specific recidivist infringers known to Frontier, Frontier obtained a direct financial benefit from that infringing activity.  That financial benefit included improper revenue that Frontier would not have otherwise received had it terminated those accounts.  Frontier decided not to terminate repeat infringers for one simple reason:  it wanted to maintain the revenue stream that it generated from their accounts.

9.     Frontier's subscribers' infringing activity that forms the basis for Plaintiffs' claims, and for which Frontier is secondarily liable, occurred *after* Frontier received multiple notices of those subscribers' infringing activity.  Specifically, Plaintiffs seek relief for copyright infringement claims that accrued starting on May 1, 2021.  Since that date, Frontier's subscribers have infringed 2,856 copyrighted works *after* those particular subscribers were identified to Frontier in multiple infringement notices, and the infringement is ongoing.  While Plaintiffs' claims accrued during this period of time, Frontier's knowledge of, and failure to take action against, repeat infringers began as early as 2013.

## THE PARTIES

### Plaintiffs

10.     Plaintiff UMG Recordings, Inc. is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.

11.     Plaintiff Capitol Records, LLC is Delaware Limited Liability Company with its principal place of business at 1750 N. Vine Street, Los Angeles, California 90068.

12.     Plaintiff ABKCO Music & Records, Inc. is a New York corporation with its principal place of business at 85 Fifth Avenue, New York, New York 10003.

13.     Plaintiff Sony Music Entertainment is a Delaware general partnership, the partners of which are citizens of Delaware.  Sony's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York 10010.

14.     Plaintiff Arista Music is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010.

15.     Plaintiff Arista Records LLC is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

16.     Plaintiff Sony Music Entertainment US Latin is a Delaware Limited Liability Company with its principal place of business at 3390 Mary Street, Suite 220, Coconut Grove, Florida 33133.

17.     Plaintiff Zomba Recording LLC is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

18.     Plaintiff Atlantic Recording Corporation is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

19. Plaintiff Elektra Entertainment Group Inc. is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

20. Plaintiff Lava Records LLC is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

21. Plaintiff Rhino Entertainment LLC is a Delaware Limited Liability Company with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

22. Plaintiff Warner Music Inc. is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

23. Plaintiff Warner Music International Services Limited is a Limited Liability Company, organized and existing under the laws of England and Wales, with its principal place of business at 27 Wrights Lane, London W8 5 SW, United Kingdom.

24. Plaintiff Warner Records Inc. is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

25. Plaintiffs are some of the largest record companies in the world, engaged in the business of producing, manufacturing, distributing, selling, licensing, and otherwise exploiting sound recordings in the United States through various media. They invest substantial money, time, effort, and talent in creating, advertising, promoting, selling, and licensing unique and valuable sound recordings embodying the performances of their exclusive recording artists.

26. Plaintiffs own and/or control in whole or in part the copyrights and/or exclusive rights in innumerable sound recordings, including the sound recordings listed on Exhibit A, which is illustrative and non-exhaustive. All of the sound recordings listed on Exhibit A have been registered, or filed pursuant to 17 U.S.C. § 1401, with the U.S. Copyright Office.

**Defendant**

27.     Defendant Frontier Communications Corporation is a corporation organized under the laws of the state of Connecticut, with its principal place of business at 401 Merritt 7, Norwalk, Connecticut 06851.  Frontier also maintains substantial operations and offices in New York.

28.     On April 14, 2020, Frontier and certain affiliated debtor entities filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the Bankruptcy Court of the United States District Court of the Southern District of New York.

29.     On April 30, 2021, Frontier emerged from Chapter 11 bankruptcy, and the Fifth Amended Joint Plan of Reorganization of Frontier Communications Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code became effective.

**JURISDICTION AND VENUE**

30.     This Court has subject matter jurisdiction over this action, which arises under the Copyright Act, 17 U.S.C. §§ 101 *et seq*., pursuant to 28 U.S.C. §§ 1331 and 1338.

31.     This Court has personal jurisdiction over Frontier pursuant to New York Civil Practice Law and Rule ("CPLR") 301.  Frontier has offices in New York, employs thousands of people in New York, has consented to jurisdiction in the state, and has pervasive corporate ties to the state that are sufficient to justify the imposition of general jurisdiction here.

32.     This Court also has personal jurisdiction over Frontier pursuant to CPLR 302. Frontier transacts business within New York to supply Internet service to customers in this state. In addition, Frontier has deliberately exploited the New York market, establishing network operations in this district, selling its services to over 80,000 New York households, and advertising its Internet service to potential subscribers in the state.  Frontier has committed

tortious acts within New York, including providing Internet service to New York subscribers who used Frontier's network to directly and repeatedly infringe Plaintiffs' copyrights; continuing to provide Internet service to, and failing to suspend or terminate the accounts of, New York customers, even after receiving multiple notices of their infringing activity; advertising its high-speed Internet service in New York to serve as a draw for subscribers who sought faster download speeds to facilitate their direct and repeated infringements; and/or responding or failing to respond to repeated notices of copyright infringement directed to infringing subscribers located in the state.  Frontier also has caused injury to Plaintiffs in this state by allowing its customers to use Frontier's network to systematically infringe Plaintiffs' copyrights, all while deriving millions of dollars in revenue from interstate commerce.

33.     Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400.

## FACTUAL BACKGROUND

34.     Representatives of Plaintiffs have transmitted to Frontier over 20,000 copyright infringement notices, which fully complied with the Digital Millennium Copyright Act ("DMCA"), detailing specific instances of its subscribers accessing P2P services via Frontier's network to unlawfully distribute and copy copyrighted works ("DMCA Notices").  P2P is a term used to refer to a decentralized network of users whereby each Internet-connected participant (i.e., a "peer" or a "node") can act as both a supplier and consumer of content files.

35.     The DMCA Notices identified the unique Internet Protocol ("IP") address assigned to each user of Frontier's network, in addition to the date and time the infringing activity was detected.  Only Frontier, as the provider of the technology and system used to infringe, had the ability required to match the IP address to a particular subscriber, as well as to contact that subscriber or terminate that subscriber's service.

8

36.     The DMCA Notices advised Frontier of clear and unambiguous infringing activity by Frontier's subscribers—that is, unauthorized downloading and distribution of copyrighted music.  Frontier's subscribers had no legal basis or justification for downloading or distributing digital copies of Plaintiffs' sound recordings to thousands or millions of strangers over the Internet.

37.     In addition to documenting the sheer volume of the infringing activity on its network, the DMCA Notices sent to Frontier identified specific subscribers who were flagrant and serial infringers.

38.     Over the years, Frontier received thousands of infringement notices from other copyright owners.  Plaintiffs are aware of some, but by no means all, of those notices.  Those notices identified thousands of other Frontier subscribers engaged in blatant and repeated infringement, with more than 4,000 subscribers identified in three or more notices and some subscribers identified in 100 or more notices.

39.     These examples and countless others amply illustrate that, rather than terminating repeat infringers—and losing subscription revenues—Frontier consciously chose to look the other way in order to continue to collect subscriber fees.

40.     During all pertinent times, Frontier had the full legal right, obligation, and technical ability to prevent or limit the infringements occurring on its network.  Under Frontier's "Acceptable Use Policy," which its subscribers agreed to as a condition of using its Internet service, Frontier was empowered to suspend or terminate a subscriber's Internet access for a variety of reasons, including a subscriber's use of its network or services for "transmitting or receiving copyright infringing . . . material."  Further, Frontier's Acceptable Use Policy expressly provided: "Repeated copyright infringements are grounds for termination of service."

9

41.     Despite these alleged policies, and despite receiving thousands of DMCA Notices from Plaintiffs' representatives, and thousands of similar notices from other copyright owners, Frontier knowingly permitted specifically identified repeat infringers to continue to use its network to infringe.  Rather than disconnect or otherwise address the Internet access of blatant repeat infringers, Frontier knowingly continued to provide these subscribers with the Internet access that enabled them to continue to illegally download or distribute Plaintiffs' copyrighted works unabated.  Frontier's provision of high-speed Internet service materially contributed to these direct infringements.

42.     Frontier's motivation for refusing to terminate or suspend the accounts of blatant infringing subscribers was simple:  it valued its own profits over its legal responsibilities. Retaining infringing subscribers provided a direct financial benefit to Frontier.  Frontier did not want to lose subscriber revenue by terminating accounts of infringing subscribers.  Frontier did not want to risk the possibility that account terminations would make its service less attractive to existing or prospective users.  Moreover, infringing subscribers were especially profitable to Frontier.  Illegal P2P activity consumes substantial Internet data usage, leading subscribers to pay more money for plans with faster Internet speeds and greater data usage.  In addition, Frontier was simply disinterested in devoting sufficient resources to tracking repeat infringers, responding to infringement notices, and terminating accounts in appropriate circumstances. Considering only its own pecuniary gain, Frontier ignored and turned a blind eye to flagrant, repeat infringement by known specific subscribers, thus facilitating and multiplying the harm to Plaintiffs.  And Frontier's failure to adequately police its infringing subscribers was a draw to subscribers to purchase Frontier's services, so that the subscribers could then use those services to infringe Plaintiffs' (and others') copyrights.  The specific infringing subscribers identified in

the DMCA Notices knew Frontier would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Frontier subscribers to continue illegally downloading copyrighted works.

43.     The consequences of Frontier's support of and profit from infringement are obvious and stark.  The use of Frontier's network by its subscribers to copy and distribute infringing copies of Plaintiffs' copyrighted works undercuts the legitimate music market, depriving Plaintiffs, and those recording artists whose works they sell and license, of the compensation to which they are entitled.  Without such compensation, Plaintiffs and their recording artists have fewer resources available to invest in the further creation and distribution of high-quality music.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Contributory Copyright Infringement Claim (17 U.S.C. § 101 *et seq*.)**

44.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

45.     Frontier and its subscribers do not have any authorization, permission, license or consent to exploit the copyrighted sound recordings at issue.

46.     Plaintiffs are the legal or beneficial owners of the copyrighted works that were infringed by Frontier's subscribers and which were duly registered, or filed pursuant to 17 U.S.C. § 1401, with the U.S. Copyright Office.  Using Internet access and services provided by Frontier, its subscribers unlawfully reproduced and distributed via BitTorrent and other P2P protocols thousands of Plaintiffs' sound recordings, including those listed on Exhibit A.  The foregoing activity constitutes direct infringement or an unauthorized act in violation of 17 U.S.C. §§ 106, 501, and 1401 *et seq.*

11

47.     Frontier is contributorily liable for the direct infringements of its subscribers described herein.  Through the DMCA Notices and other means, Frontier had knowledge that its network was being used for copyright infringement on a massive scale; Frontier also knew which specific subscribers engaged in such repeated and flagrant infringement.  Nevertheless, Frontier facilitated, encouraged, and materially contributed to such infringement by continuing to provide its network and the facilities necessary for its subscribers to commit repeated infringements. Frontier had the means to withhold that assistance upon learning of specific infringing activity by specific users but failed to do so.

48.     By purposefully ignoring and turning a blind eye to its subscribers' flagrant and repeated infringements, Frontier knowingly caused and materially contributed to the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibit A, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

49.     Each infringement of Plaintiffs' copyrighted sound recordings constitutes a separate and distinct act of infringement.

50.     The foregoing acts of infringement by Frontier have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights.  Indeed, the sound recordings listed on Exhibit A represent works infringed by Frontier's subscribers *after* Plaintiffs identified those particular subscribers to Frontier in multiple DMCA Notices.

51.     As a direct and proximate result of its wrongful conduct, Frontier has and will obtain benefits, including, but not limited to, profits to which Frontier is not entitled.

52.     As a direct and proximate result of Frontier's wrongful conduct, Plaintiffs have been, and will continue to be, substantially and irreparably harmed in an amount not readily

capable of determination.  Unless restrained by this Court, Frontier will cause further irreparable injury to Plaintiffs.

53.     As a direct and proximate result of Frontier's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each of the 2,856 works infringed, or such other amount as may be proper under 17 U.S.C. § 504(c).

54.     Plaintiffs are also entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

### SECOND CAUSE OF ACTION
**Vicarious Copyright Infringement Claim (17 U.S.C. § 101 *et seq.*)**

55.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

56.     Frontier and its subscribers have no authorization, license or other consent to exploit the copyrighted sound recordings at issue.

57.     Plaintiffs are the legal or beneficial owners of the copyrighted works that were infringed by Frontier's subscribers and which were duly registered, or filed pursuant to 17 U.S.C. § 1401, with the U.S. Copyright Office.  Using Internet access and services provided by Frontier, its subscribers unlawfully reproduced and distributed via BitTorrent and other P2P protocols thousands of Plaintiffs' sound recordings, including those listed on Exhibit A.  The foregoing activity constitutes direct infringement or an unauthorized act in violation of 17 U.S.C. §§ 106, 501, and 1401 *et seq.*

58.     Frontier had the legal right and practical ability to supervise and control the infringing activities that occurred through the use of its network and at all relevant times had a financial interest in, and derived direct financial benefit from, the infringing use of its network.

13

Frontier derived an obvious and direct financial benefit from its subscribers' infringement.  The ability to use Frontier's high-speed Internet facilities to illegally download Plaintiffs' copyrighted works served to draw, maintain, and generate higher fees from paying subscribers to Frontier's service.  Among other financial benefits, by failing to terminate the accounts of specific repeat infringers known to Frontier, Frontier earned illicit revenue through user subscription fees that it would not have otherwise received from repeat infringers, as well as new subscribers drawn to Frontier's services for the purpose of illegally downloading copyrighted works.  The specific infringing subscribers identified in the DMCA Notices knew Frontier would not terminate their accounts despite Frontier's receipt of multiple notices identifying them as infringers, and they remained Frontier subscribers to continue illegally downloading copyrighted works.

59.     Frontier is vicariously liable for the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibit A, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

60.     Each infringement of Plaintiffs' copyrighted sound recordings constitutes a separate and distinct act of infringement.

61.     The foregoing acts of infringement by Frontier have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights.  Indeed, the sound recordings listed on Exhibit A represent works infringed by Frontier's subscribers *after* Plaintiffs identified those particular subscribers to Frontier in multiple prior DMCA Notices.

62.     As a direct and proximate result of its wrongful conduct, Frontier has and will obtain benefits, including, but not limited to, profits to which Frontier is not entitled.

14

63.     As a direct and proximate result of Frontier's wrongful conduct, Plaintiffs have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination.  Unless restrained by this Court, Frontier will cause further irreparable injury to Plaintiffs.

64.     As a direct and proximate result of Frontier's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each of the 2,856 works infringed, or such other amount as may be proper under 17 U.S.C. § 504(c).

65.     Plaintiffs are also entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment against Frontier as follows:

A.     Declaring that Frontier willfully infringed Plaintiffs' copyrighted sound recordings;

B.     Issuing a preliminary and permanent injunction enjoining Frontier, and its agents, servants, employees, attorneys, successors and assigns, and all persons, firms, and corporations acting in active concert or participation with it, from directly or indirectly reproducing, distributing, publicly displaying, creating derivative works, otherwise infringing or causing, enabling, facilitating, encouraging or inducing the reproduction, distribution, public display, creation of derivative works or other infringement of, any of the respective copyrights owned or exclusively controlled, in whole or in part, by Plaintiffs, whether now

in existence or hereinafter created, and ordering that all unlawful copies be destroyed;

C.     Entering judgment for Plaintiffs against Frontier for statutory damages in an amount based upon Frontier's willful acts of infringement of Plaintiffs' copyrighted sound recordings and unauthorized acts, as alleged above, pursuant to the Copyright Act, 17 U.S.C. §§ 101 *et seq.*;

D.     Alternatively, ordering Frontier to render a full and complete accounting to Plaintiffs of Frontier's profits, gains, advantages or the value of business opportunities received from the foregoing acts of infringement and entering judgment for Plaintiffs against Frontier for all damages suffered by Plaintiffs and for any profits or gain by Frontier attributable to the infringements of Plaintiffs' copyrights and unauthorized acts alleged above in amounts to be determined at trial;

E.     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

F.     Awarding Plaintiffs pre-judgment and post-judgment interest, to the fullest extent available, on the foregoing; and

G.     Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a jury trial on all issues so triable in this action.


Dated: June 8, 2021                              OPPENHEIM + ZEBRAK, LLP
        Washington, DC

                                              _/s/  Matthew J. Oppenheim_____
                                              Matthew J. Oppenheim
                                              Lucy Grace D. Noyola (*pro hac vice motion forthcoming*)
                                              4530 Wisconsin Avenue, NW, Fifth Floor
                                              Washington, DC 20016
                                              Tel:  202-480-2999
                                              matt@oandzlaw.com
                                              lucy@oandzlaw.com


                                              *Attorneys for Plaintiffs*